IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

BARRY KEYES                              :
                                         :    CIVIL ACTION
        v.                               :
                                         :    NO. 09-1887
CATHOLIC CHARITIES OF THE                :
ARCHDIOCESE OF PHILADELPHIA              :
and DON GUANELLA VILLAGE                 :

**SURRICK, J.**                                                January 20, 2010

## MEMORANDUM

Presently before the Court is Defendants Catholic Charities of the Archdiocese of Philadelphia and Don Guanella Village's Motion for Summary Judgment. (Doc. No. 15.) For the following reasons, the Motion will be granted.

**I.     BACKGROUND**

From October 31, 2005, through September 21, 2007, Plaintiff Barry Keyes worked as a registered nurse for Defendant Don Guanella Village ("Defendant").[1] Don Guanella Village is a home for developmentally disabled teenagers with special needs. (Doc. No. 1 ¶ 16.) In September 2005, Plaintiff began to suspect that he was suffering from sleep apnea. (Keyes Dep. 17:16-19.) Plaintiff did not undergo testing to confirm this condition until after his employment with Defendant was terminated in 2007. (Doc. No. 19 Ex. D.)

Plaintiff was consistently late for work. (Keyes Dep. 22:19-23:1.) He was scheduled to arrive at work at 6:30 a.m. every day, but he frequently arrived fifteen or more minutes late. (*Id.*)

---

[1] Plaintiff originally filed this lawsuit against Catholic Charities of the Archdiocese of Philadelphia and Don Guanella Village. In his response to Defendants' Motion for Summary Judgment, he advised that he was not pursuing his claim against Catholic Charities of the Archdiocese of Philadelphia. (Doc. No. 19 at 28.) The sole remaining defendant in this action is Don Guanella Village.

Plaintiff informed Carol Thomas, who was the Director of Nursing, that he was having difficulty sleeping. (*Id.* at 22:1-8.) Plaintiff also informed Thomas that he suspected that he had sleep apnea. (*Id.* at 20:20-21:8.) Thomas suggested that a surgical procedure could cure Plaintiff's sleep apnea. (*Id.*) Thomas did not discipline Plaintiff for his tardiness at that time. (*Id.* at 23:3-5.)

In January 2007, Thomas and Fran Hagarty, the chief administrator of Don Guanella Village, formally disciplined Plaintiff for his tardiness by giving him a verbal warning. (*Id.* at 66:1-21; Doc. No. 15, Ex. D.) During discussion of the verbal warning, Plaintiff told Thomas and Hagarty that he was having trouble sleeping and suspected that he had sleep apnea. (Keyes Dep. 67:6-17.) In the week following the verbal warning, Plaintiff was late for work three times. On January 11, he was 55 minutes late. On January 12, he was 24 minutes late. And on January 13, he was 36 minutes late. (Doc. No. 15, Ex. E.) As a result, Thomas and Hagarty again met with Plaintiff to discuss his tardiness issues. (Keyes Dep. 70:24-72:13.) This time, Plaintiff was given a written warning stating that he would be suspended without pay if he was late three more times in the next three months. (Doc. No. 15 Ex. E.) During the meeting, Plaintiff again informed Thomas and Hagarty that he believed he was suffering from sleep apnea. (Keyes Dep. 72:8-13.) Finally, on February 2, 2007, after Plaintiff was late three times in a four-day period at the end of January (Doc. No. 15 Ex. F), Thomas and Hagarty informed him that he would be suspended from work without pay for two days. (*Id.*; Keyes Dep. 73:9-74:9.) They further told him that he would be terminated if he was late for work three more times in the next three months. (*Id.*; Keyes Dep. 75:2-6.) Plaintiff again explained to Thomas and Hagarty that he believed he had sleep apnea. (Keyes Dep. 74:16-24.) After this suspension, Plaintiff took steps

2

to remedy the lateness problem. He bought a second alarm clock and had his wife wake him up in the morning. As a result, Plaintiff was no longer late for work. (*Id. at* 75:7-24; 76:14-24; 77:1-16.)

Seven months later, in September of 2007, Plaintiff was involved in a verbal altercation with another nurse, Denise Dill, who he believed had abandoned her assignment. (*Id.* at 78:1-80:11.) After this dispute, Plaintiff called Thomas and told her that he was upset about the situation with Dill. Plaintiff threatened to resign if he had to work with Dill again. (*Id.* at 84:20-86:4; 94:20-95:3.) He also asked Thomas for permission to leave work early because his blood pressure was elevated and he was considering going to the emergency room. (*Id.* at 85:17-23.) Thomas granted Plaintiff's request. (*Id.* at 86:8-10.)

On September 17 or 18, Plaintiff faxed a letter to Thomas explaining his behavior. (*Id.* at 89:20-90:10.) In the letter, Plaintiff explained that he felt like he was "drowning and ha[d] felt that way for a while. No energy, bad feet, weight gain, always fatigued and behind in [his] work." (Doc. No. 19 Ex. E.) Plaintiff's letter stated that he had made several medical appointments, "most importantly the sleep study." (*Id.*) Plaintiff also apologized to Thomas for telling her that he would resign. (*Id*.) Thomas acknowledges receiving and reading the letter from Plaintiff but states that she had not "really listened to the letter, really understood the letter."[2] (Thomas Dep. 20:10-11; 25:1-9.)

---

[2] A factual dispute exists as to whether Plaintiff told Defendant that he suffered from sleep problems and suspected that he had sleep apnea. Thomas and Hagarty deny knowing that Plaintiff had this problem. (Thomas Dep. 18:19-19:6.) Plaintiff insists that he told them of this problem on multiple occasions. We view the facts and inferences to be drawn therefrom in the light most favorable to Plaintiff. *Siegel Transfer, Inc. v. Carrier Express, Inc.*, 54 F.3d 1125, 1127 (3d Cir. 1995). Accordingly, we assume for purposes of this Motion that Defendant knew that Plaintiff had sleep problems and that he suspected that he suffered from sleep apnea.

3

To address the confrontation between Plaintiff and Dill, Thomas and Hagarty held a meeting with Plaintiff on September 20, 2007. (Keyes Dep. 104:1-8.) During the meeting, Thomas asked Plaintiff if he needed to take time off to deal with his sleep apnea issues. Plaintiff said no. (*Id.* at 109:6-10.) Plaintiff said that although he was not feeling well due to his sleep apnea, he would be able to give 90% effort, which he considered to be "more than sufficient." (*Id.* at 109:18-110:1.) Plaintiff testified that after mentioning his sleep apnea, he perceived that "the whole dynamic of the conversation changed" based on "their non-verbals." (*Id.* at 110:8-16.) He immediately felt that he was going to be terminated. (*Id.*) Hagarty testified that Plaintiff informed him and Thomas that his "heart was simply no longer in the job and that he was requesting six months' time for him to find another position." (Hagarty Dep. 28:24-29:4; Thomas Dep. 16:22-17:8.) Plaintiff agrees that he told Hagarty and Thomas that his heart and soul were not in the job. (Doc. No. 19 at 8; Keyes Dep. 116:5-24; 117:1-20.) The next day, Thomas told Hagarty that considering the dedication needed in dealing with these special needs teenagers, she could not "in good faith have [Plaintiff] come back knowing that his heart [wa]s not in it." (Thomas Dep. 18:5-13.) Hagarty contacted Plaintiff and informed him that in light of their discussion the previous day, he and Thomas did not feel that it was in Defendant's best interest for Plaintiff to continue his employment with Defendant. (*Id.* at 18:14-18.)

Soon after his employment was terminated, Plaintiff visited the Center for Sleep Medicine at Underwood Memorial Hospital, where a sleep study was done. The sleep study confirmed that Plaintiff suffered from "Severe Obstructive Sleep Apnea Syndrome." (Doc. No. 19 Ex. D at 2.) After diagnosing Plaintiff as having "sleep apnea," Plaintiff's doctor prescribed a CPAP machine for use when Plaintiff was sleeping. The CPAP machine completely cured

4

Plaintiff's sleep apnea. (Keyes Dep. 30-36; 51-53.) Plaintiff never requested an accommodation from Defendant for his sleep apnea, and he is not pursuing a claim for failure to accommodate. (Doc. No. 19 at 27-28.)

II.     **LEGAL STANDARD**

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A genuine issue of material fact exists only when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party moving for summary judgment bears the initial burden of demonstrating that there are no facts supporting the nonmoving party's legal position. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986). Once the moving party carries this initial burden, the nonmoving party must set forth specific facts showing that there is a genuine issue for trial. Fed. R. Civ. P. 56(e); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (explaining that the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts"). The nonmoving party cannot "rely merely upon bare assertions, conclusory allegations or suspicions" to support its claim. *Fireman's Ins. Co. v. DeFresne*, 676 F.2d 965, 969 (3d Cir. 1982). Rather, the party opposing summary judgment must go beyond the pleadings and present evidence through affidavits, depositions, or admissions on file to show that there is a genuine issue for trial. *Celotex*, 477 U.S. at 324. When deciding a motion for summary judgment, we must view facts and inferences in the light most favorable to the nonmoving party. *Anderson*, 477 U.S. at 255; *Siegel Transfer*, 54 F.3d at 1127. We must not resolve factual

5

disputes or make credibility determinations. *Siegel Transfer*, 54 F.3d at 1127.

## III. DISCUSSION

Plaintiff asserts claims for disability discrimination under the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 *et seq.* ("ADA"), and the Pennsylvania Human Relations Act, 43 Pa. Stat. Ann. § 951 *et seq.* ("PHRA"). Since Pennsylvania courts "generally interpret the PHRA in accord with its federal counterparts," *Rinehimer v. Cemcolift, Inc.*, 292 F.3d 375, 382 (3d Cir. 2002) (citations and internal quotation marks omitted), our analysis of Plaintiff's ADA claims is equally applicable to his PHRA claims.

Both parties agree that because the Plaintiff cannot offer direct proof of discrimination based on disability, he must proceed under the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). (Doc. No. 15 at 8; Doc. No. 19 at 12-13.) Under *McDonnell Douglas*, the plaintiff bears the initial burden of establishing a prime facie case of discrimination. *McDonnell Douglas*, 411 U.S. at 802. The burden then shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the adverse action. *Id.* This shifts the burden back to the plaintiff to show that the defendant's stated reason for taking the adverse action was a pretext for discrimination. *Id.* at 804.

### A. Plaintiff's Prima Facie Case

To establish a claim for disability discrimination under the ADA, a plaintiff must show that he is a "qualified individual with a disability" and that he suffered an adverse employment action as a result of discrimination. *Tice v. Centre Area Transp. Auth.*, 247 F.3d 506, 512 (3d Cir. 2001). Under the ADA, a "qualified individual with a disability" is defined as "an individual who, with or without reasonable accommodation, can perform the essential functions

6

of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). The ADA defines "disability" as "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." *Id.* § 12102(1). Defendant argues that Plaintiff's action for disability discrimination fails because Plaintiff cannot establish that he suffers from a disability. (Doc. No. 15 at 10-15.) Plaintiff responds that his condition meets the definition of "disability" under the ADA because he has an impairment that substantially limits one or more major life activities, and he was regarded as having such an impairment by Defendant. (Doc. No. 19 at 15.)

       1.  *Impairment that Substantially Limits One or More Major Life Activities*

To establish that he has a disability that is protected by the ADA, Plaintiff "must show that [he] has an impairment; identify the life activity that [he] claims is limited by the impairment; and prove that the limitation is substantial." *Fiscus v. Wal-Mart Stores, Inc.*, 385 F.3d 378, 382 (3d Cir. 2004) (quoting *Bragdon v. Abbott*, 524 U.S. 624, 631 (1998)) (internal quotation marks omitted). The ADA does not define the term "major life activity"; however, regulations issued by the Equal Employment Opportunity Commission ("EEOC") provide that the term includes, but is not limited to, "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(i). Courts conduct a two-step analysis to determine if a plaintiff is substantially limited in one or more major life activities. First, the court determines if the plaintiff is substantially impaired in a major life activity other than working. If the individual is not so impaired, then the court must determine if the plaintiff is limited in the major life activity of working.

7

*Mondzelewski v. Pathmark Stores, Inc.*, 162 F.3d 778, 783-84 (3d Cir. 1998). In assessing whether a major life activity is substantially limited, a court should consider the following factors: "(i) [t]he nature and severity of the impairment; (ii) [t]he duration or expected duration of the impairment; and (iii) [t]he permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment." 29 C.F.R. § 1630.2(j)(2)(i)-(iii).

Plaintiff contends that he is substantially limited in the major life activities of breathing and sleeping. (Doc. No. 19 at 16-18.) He bases his contention on the report setting forth the results of his sleep study, which was conducted after he was terminated from Don Guanella Village. The report diagnoses Plaintiff with "Severe Obstructive Sleep Apnea Syndrome" and notes "[s]evere sleep disordered breathing . . . with oxygen desaturations as low as 89%" during the sleep study. (*Id.* Ex. D.) The report recommends that Plaintiff sleep with a CPAP machine to alleviate the symptoms of his sleep apnea. (*Id.*) Plaintiff testified that the CPAP machine "cured [his] sleep apnea" and allowed him to get a "restful and solid" night of sleep. (Keyes Dep. 51:13-52:24.)

The sleep study, even when combined with Plaintiff's testimony that he would sometimes wake up "short of breath" and "gasping for air" (*Id*. at 52:5-11), is not sufficient to establish that Plaintiff's sleep apnea substantially impaired the major life activity of breathing. There is little evidence in this record to establish that Plaintiff's breathing was substantially impaired. There is no evidence to suggest that Plaintiff's breathing was impaired during the day while he was at work. Moreover, it is undisputed that any breathing impairment at night was cured by the CPAP machine. (*Id.* at 51:13-52:24.) Since Plaintiff has been using the CPAP machine he has had no follow-up visits with his doctor. (*Id.* at 35-36.) Under the circumstances, it cannot be said that

Plaintiff's sleep apnea is an impairment that substantially limits Plaintiff's major life activity of breathing. *See* 29 C.F.R. § 1630.2(j)(2)(ii)-(iii) (requiring courts to consider the duration of the impairment and any long-term effects when determining whether the impairment substantially limits a major life activity). In addition, "[a] person whose physical or mental impairment is corrected by medication or other measures does not have an impairment that presently 'substantially limits' a major life activity." *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 482-83 (1999).[3] We therefore find that Plaintiff was not substantially limited in the major life activity of breathing.

With regard to Plaintiff's argument that he was substantially limited in the major life activity of sleeping, although sleeping does not appear in the EEOC's nonexhaustive list of major life activities, *see* 29 C.F.R. § 1630.2(i), several circuits have found sleep to be a major life activity, as have courts in this District. *See, e.g.*, *Heisler v. Metro. Council*, 339 F.3d 622, 628 (8th Cir. 2003); *E.E.O.C. v. Sara Lee Corp.*, 237 F.3d 349, 352 (4th Cir. 2001); *Swanson v. Univ. of Cincinnati*, 268 F.3d 307, 316 (6th Cir. 2001); *Steele v. Thiokol Corp.*, 241 F.3d 1248, 1253 (10th Cir. 2001); *McAlindin v. County of San Diego*, 192 F.3d 1226, 1234-35 (9th Cir. 1999); *Pack v. Kmart Corp.*, 166 F.3d 1300, 1305 (10th Cir. 1999); *Colwell v. Suffolk County Police Dep't*, 158 F.3d 635, 644 (2d Cir.1998); *accord Peter v. Lincoln Tech. Inst., Inc.*, 255 F. Supp. 2d 417, 432-33 (E.D. Pa. 2002); *Reese v. Am. Food Serv.*, No. 99-1741, 2000 WL 1470212, at *6 (E.D. Pa. Sept. 29, 2000).

---

[3] Congress legislatively overturned *Sutton* in the ADA Amendments Act of 2008, Pub. L. No. 110-325, 122 Stat. 3553, 3556 (2008). However, the ADA Amendments Act of 2008 is not retroactive. *Seibert v. Lutron Elecs.*, No. 08-5139, 2009 WL 4281474, at *7 n.6 (E.D. Pa. Nov. 30, 2009).

Plaintiff again relies on the results of his sleep study, which examined his sleeping on one night after his termination from Don Guanella Village. (Doc. No. 19 at 17-18.) Aside from the sleep study, which showed that Plaintiff was asleep 72.1% of the time that he was in bed (*id.* Ex. D), and Plaintiff's testimony that he was "having difficulty sleeping" and suffered from "excessive snoring and daytime drowsiness" (Keyes Dep. 67:14-17; 11:19-21), there is little evidence to show that Plaintiff's ability to sleep was substantially limited. Moreover, the CPAP machine completely cured Plaintiff's sleep apnea and allowed him to get a "restful and solid" night of sleep. (*Id*. at 51:13-52:24.)

Plaintiff cites *Peter*, for the proposition that "a severe restriction in the ability to sleep is sufficient to meet the ADA's requirements." (Doc. No. 19 at 17 (citing *Peter*, 255 F. Supp. 2d at 432-33).) The court in *Peter* denied the defendant's motion for summary judgment, finding that the plaintiff had offered sufficient evidence to create a triable issue of fact as to whether she was substantially impaired in her ability to sleep. *Peter*, 255 F. Supp. 2d at 434. The record in *Peter*, however, stands in stark contrast to the record in the instant case. The record in *Peter* established that the plaintiff would wake up five or six times per night. *Id.* Her sleeping problems were so severe that she would fall asleep several times during the day, including while transferring phone calls at work and even while standing up. *Id.* The plaintiff underwent therapy with a CPAT machine, surgery on her tonsils and adenoids, and pure-oxygen therapy, to no avail. *Id.* In this case, there is nothing in the record to suggest that Plaintiff fell asleep at work or while driving, much less standing up as had the plaintiff in *Peter*. There is little testimony about Plaintiff's sleeping habits except that his snoring disturbed his wife. (Keyes Dep. 18:21-19:3.) Plaintiff specifically testified that he suffered daytime fatigue which occurred at intervals, mostly after

10

work when he got home. It adversely affected his activity and energy levels and his ability to perform household chores. (Keyes Dep. 47:8-49:7.) Plaintiff testified that during the workday he would get "a little drowsy" at times but that a cup of coffee would help. (*Id.* at 49:3-7.) Moreover, Plaintiff's sleep apnea responded well to treatment with a CPAP machine, unlike the plaintiff in *Peter*, who found no relief despite undergoing several surgeries and therapies. (*Compare* Keyes Dep. 51:13-52:24 *with Peter*, 255 F. Supp. 2d at 434.) Plaintiff has failed to establish a triable issue of fact as to whether he was substantially limited in the major life activity of sleeping.

Turning to whether Plaintiff was substantially limited in the major life activity of working, Plaintiff devotes only one sentence of his response to this issue. Plaintiff argues that he has "produced evidence he was having trouble [working] as well, since he advised his superiors his condition left him with 'no energy.'" (Doc. No. 19 at 17.) This is not sufficient to establish that Plaintiff was substantially limited in his ability to work. To be substantially limited in the major life activity of working, "one must be precluded from more than one type of job, a specialized job or a particular job of choice." *Sutton*, 527 U.S. at 492. Plaintiff has testified that notwithstanding his sleep problems he was able to perform his daily activities at Don Guanella Village and that he "excel[led]" at his job. (Keyes Dep. 45:14-24; 55:17-20.) Plaintiff's contention that his ability to work was substantially impaired is without merit.

### 2. Regarded as Having an Impairment

A plaintiff is regarded as having an impairment when "(1) a covered entity mistakenly believes that a person has a physical impairment that substantially limits one or more major life activities, or (2) a covered entity mistakenly believes that an actual, nonlimiting impairment

11

substantially limits one or more major life activities." *Sutton*, 527 U.S. at 489.

As discussed above, Plaintiff and Defendant dispute whether Defendant was aware that Plaintiff suffered from sleep apnea. (Doc. No. 15 at 14; Doc. No. 19 at 19-20.) Assuming for purposes of this Motion that Defendant was aware of Plaintiff's sleep apnea, "the mere fact that the employer was aware of the employee's . . . impairment [i]s insufficient to show that the employer regarded the employee as disabled within meaning of ADA." *Rinehimer*, 292 F.3d at 382 (citing *Kelly v. Drexel Univ.*, 94 F.3d 102, 106 (3d Cir. 1996)). Indeed, the mere awareness that an employee is impaired cannot establish that an employer regarded the employee as disabled even when that awareness is combined with a change in work assignments. *Id.* (citing *Kelly*, 94 F.3d at 106). Rather, to prevail on a "regarded as" claim under the ADA, a plaintiff must establish that his employer regarded him as unable to perform a wide range of jobs. *Id.* at 381 (citing *Taylor v. Pathmark Stores, Inc.*, 177 F.3d 180, 187 (3d Cir. 1999)); *see also* 29 C.F.R. § 1630.2(j)(3)(i) ("The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working.").

Plaintiff argues that Thomas and Hagarty's body language visibly changed after he informed them of his sleep apnea in the meeting that immediately preceded his termination. (Keyes Dep. 110:5-16.) Plaintiff further testified that after he mentioned his sleep apnea, he "felt for the first time ever in [his] life that [he] was going to be terminated." (*Id.*) Plaintiff also contends that Thomas's statement that she could not, "in good faith, have [Plaintiff] come back knowing that his heart is not in it" (Thomas Dep. 18:5-13) establishes that Defendant "had a clear, negative attitude toward [Plaintiff's] sleep apnea and did not feel that Plaintiff could do his job because of it." (Doc. No. 19 at 20.)

12

Viewed in the light most favorable to Plaintiff, the record establishes only that Thomas and Hagarty were aware of Plaintiff's sleep apnea and terminated him after he told them that his heart was no longer in his job. Even assuming that Thomas and Hagarty believed that Plaintiff's heart was no longer in his job because of his sleep apnea, no reasonable jury could find that Defendant regarded Plaintiff as unable to perform a wide range of jobs, as is required to establish a claim for "regarded as" discrimination. Plaintiff's claim that he was regarded as disabled by Defendant therefore fails.

B.  **Defendant's Reasons for the Adverse Action**

Notwithstanding Plaintiff's failure to establish a prima facie case of disability discrimination, we will nevertheless assume a prima facie case and complete the *McDonnell Douglas* burden-shifting analysis by examining Defendant's reasons for Plaintiff's termination and Plaintiff's assertion that they were pretextual.

Defendant proffers that Plaintiff was terminated because he told Thomas and Hagarty that his heart was no longer in his work. (Doc. No. 15 at 15.) Plaintiff concedes that he made this statement to Thomas and Hagarty. (Doc. No. 19 at 8.) Defendant argues that this is a legitimate, nondiscriminatory reason for the termination. As Hagarty explained in his deposition:

> The individuals that we serve demand and require one's commitment to service, and it cannot be that someone reports to work in such a critical position and offers openly that their heart is not in it. I don't know if you would want [Plaintiff], after making such a statement, providing medical treatment, assessment, or any other type of medical support to your loved ones, but it's my responsibility to ensure that the men residing at a Cardinal Krol Center receive the attention that they deserve, and one's heart not being in it is simply unacceptable.

(Hagarty Dep. 31:6-23.)

We are satisfied that telling an employer that your heart is no longer in your work when

13

your work is as a caretaker for special needs teenagers, constitutes a legitimate, nondiscriminatory reason for termination.

### C. Whether Defendant's Stated Reason for Taking the Adverse Action Was a Pretext for Discrimination

We must next consider whether Defendant's stated reason for taking the adverse action was a pretext for discrimination. Proving pretext "places a difficult burden on the Plaintiff." *Fuentes v. Perskie*, 32 F.3d 759, 765 (3d Cir. 1994). To defeat summary judgment, Plaintiff must point to some evidence from which a reasonable factfinder could either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action. *Id.* at 764 (citations omitted). In other words, a plaintiff must put forward "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder *could* rationally find them unworthy of credence." *Id.* at 765 (citations and internal quotation marks omitted).

Plaintiff argues that "Defendant has offered significantly inconsistent reasons for Plaintiff's termination." (Doc. No. 19 at 20.) Plaintiff points to Hagarty's insistence that Plaintiff resigned rather than being terminated as evidence of this inconsistency. (*Id.*) Hagarty testified in his deposition that Plaintiff resigned when he "verbally offered that his heart was simply no longer in the job" and asked for six months' time to find another position. (Hagarty Dep. 28:24-29:4.) Hagarty admits that Plaintiff never submitted a letter of resignation or said the words "I resign." (*Id.* at 29:3-30:9.) However, it is clear that Plaintiff was the first to use the term "resign." (Keyes Dep. 84:20-86:4; 94:20-95:3; Doc. No. 19 Ex. E.)

The confusion over whether Plaintiff resigned or was terminated does not establish that Defendant's stated reason for Plaintiff's termination was a pretext for discrimination. Assuming for purposes of this Motion that Plaintiff was terminated, the mere fact that Hagarty believed Plaintiff had resigned when he told Hagarty and Thomas that his heart was no longer in the job does not establish that Defendant's reason for terminating Plaintiff was a pretext for discrimination.

Plaintiff further argues that Hagarty stated that Plaintiff's work performance "was never a concern" (Keyes Dep. 37:1-2), and therefore Defendant cannot claim that there was a basis to terminate Plaintiff over patient care issues. (Doc. No. 19 at 21.) But there is no inconsistency here. Just because Plaintiff's work performance was never a concern prior to his meeting with Thomas and Hagarty does not mean that his admission that his heart was no longer in his work could not raise concerns about his ability to provide appropriate care in the future. As Hagarty pointed out during his deposition, nobody would want a mentally disabled loved one to be cared for by a healthcare professional whose heart was no longer in his job. (Hagarty Dep. 31:6-23.)

Plaintiff has failed to put forward sufficient inconsistences, weaknesses, or implausibilities in Defendant's proffered reasons for terminating Plaintiff that a reasonable factfinder could rationally find them unworthy of credence. *Fuentes*, 32 F.3d at 765. Because Defendant has offered a legitimate, nondiscriminatory reason for Plaintiff's termination, and Plaintiff has failed to show that this reason is a pretext for discrimination, summary judgment in favor of Defendant is appropriate.

IV. **CONCLUSION**

For the foregoing reasons, Defendants Catholic Charities of the Archdiocese of

Philadelphia and Don Guanella Village's Motion for Summary Judgment is GRANTED.

An appropriate Order follows.

BY THE COURT:

_____
R. Barclay Surrick, J.